UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS BEAUMONT DIVISION

| | |
|---|---|
| **ROBERT CHARLES LADD,** ) | CIVIL ACTION NO. |
| Petitioner, ) | 1:03cv00239 |
| v. ) | |
| **DOUG DRETKE,** ) | **POST-HEARING BRIEF** |
| Respondent. ) | |
| ) | |

There was significant confusion at the evidentiary hearing regarding the term "related" as that term has been used at some point in time and in some states in definitions of "mental retardation." In *Atkins v. Virginia*, 536 U.S. 304, 317 (2002), the United States Supreme Court specifically noted that it left it up to the individual states as to how to implement that decision. Indeed, Respondent has repeatedly pointed out to the Court that it must apply the *Texas* definition of "mental retardation." Tr. 40-43. In *Ex Parte Briseno*, 135 S.W. 3d 1, 8 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals held that the State of Texas would follow the definition of "mental retardation" set forth by the American Association of Mental Retardation (the "AAMR") *or* as set forth in Tex. Health & Safety Code § 591.003(13). *See also Howard v. Texas*, 153 S.W3d 382, 386 (Tex. Crim. App. 2004) .

The *current* AAMR definition of "mental retardation" is:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

*Morris v. Dretke*, 2005 U.S. App. LEXIS 11430, *5 n.1 (5th Cir. June 16, 2005) The definition of "mental retardation" set forth in Tex. Health & Safety Code § 591.003(13) is: "'Mental retardation' means significantly subaverage general intellectual functioning that is concurrent

with deficits in adaptive behavior and originates during the developmental period."[1]  In short *none* of these definitions use the term "related."[2]

Indeed, to the extent the AAMR used the word "related" in its 1992 definition cited in *Atkins* and as used in some state statues around the nation, it appears that the concern was that persons not be civilly committed where their adaptive deficits were a reflection of physical handicaps rather than mental handicaps.  *See, e,.g., McClure v. State*, 737 P.2d 1001, 1003 (Ut. 1987); *State v. Grandy*, 623 P.2d 666, 671 (Or. Ct. App. 1981).  This, of course, makes sense.  When one has a dual psychological diagnosis, it will often be impossible to relate a deficit in adaptive skills to one particular diagnoses, whereas, it will often be relatively easy to determine if an adaptive skill is "related" to a mental handicap as opposed to a physical handicap.

### I. Subaverage Intelligence

There is no doubt that Robert Ladd was given two IQ tests, one while in the custody of TYC and one by Dr. Thomas Allen.  There is some question as to whether he was also given an IQ test while in the custody of the TDC, but, even if such a test was given, it was simply an abbreviated, group test.

As established by Respondent's own records, an agent of the State of Texas gave Mr. Ladd an IQ score of 67 after performing a full scale Weschler test in 1969.  Pet. Exs. 3A, 3G,

---

[1] Similarly, the *DSM IV* defines "mental retardation" as: A) Significantly subaverage intellectual functions: an IQ of approximately 70 or below on an individually administered IQ test; B) Concurrent deficits or impairment in present adaptive functioning in at least two listed areas; and C) The onset is before 18.

[2] In the one case where the Texas Court of Criminal Appeals found a defendant to be retarded, it noted:
> The three reports from the mental health experts that the trial court considered are consistent with one another and with the report from the TDCJ Mentally Retarded Offender Program. The reports establish that the applicant has (1) significant subaverage general intellectual functioning, (2) concurrent with deficits in adaptive functioning, (3) that occurred before age 18.

3E.³ Respondent did not challenge the methods or validity of the test preformed by the state's agent at the evidentiary hearing in this case. All parties conceded that Mr. Ladd malingered to some degree on the test given by Dr. Allen- malingering almost to be expected in the context in which Dr. Allen's test was given- and, therefore, the IQ score received on Dr. Allen's test is invalid. As for the score reported in TDC, it was alleged that Mr. Ladd was given a *group* BETA test in 1980 in which he scored an 86, curiously however, this test is never reflected on prison records until 1989. Moreover, the BETA is simply an abbreviated screening test with little value. Tr. at 84-86, 402-06.⁴

In sum, the one valid IQ test given to Mr. Ladd, and the only one given prior to age 18 (in 1969 Mr. Ladd was 12 years old), establishes that Mr. Ladd is of subaverage intelligence.

## II. Adaptive Skills

If the "relatedness" concept is correctly put aside, the analysis is complete, because Respondent concedes that Mr. Ladd has adaptive skill deficits in at least two areas. Tr. 449-50. Nevertheless, even if there is a "related" gloss placed upon the adaptive skills prong of the "mental retardation" definition, Mr. Ladd clearly meets the test.

---

*Ex Parte Modden*, 147 F.3d 293, 298 (2004). There is absolutely no indication that the Court searched for any concept of "relatedness."
³     Respondent's expert, Dr. Allen, noted that, in the past, TYC has noted when a test taker has malingered on this test, but no such notation was present here. Tr. 393-94.
⁴     It is also acknowledged that Mr. Ladd received a GED while in prison with an average score of 42. Pet. Ex. 4H. It is undisputed that, had Mr. Ladd taken the GED today and received the same scores, he would have failed. Tr. at 104-06, 189-90. Even Dr. Allen admitted that the fact that Mr. Ladd passed the GED was "no big deal" to him. Tr. at 437-38.

Nelma Thomas, the sibling closest to Mr. Ladd while he was in his formative years, testified about his difficulty in playing simple card games and kickball because he could not grasp the rules. Tr. at 237-38. He would often go outside in freezing weather without a shirt and shoes. *Id*. at 241. When their mother would send him to the store with a simple order, he had to return repeatedly because he could not remember the order. *Id*. at 241-42. He would often get whipped for repeating the same behavior. *Id*. at 242. The siblings thought he was "different" because he had a different father and would call him names such as "retarded." *Id*. at 240-41.

Even more important is the testimony of Carolyn Collins who was Mr. Ladd's supervisor at ADI. She had been threatened by Mr. Ladd and had testified *against* him at his state trial and had no reason to lie in his favor. Collin's Dep. at 6, 49. While at ADI, his performance was reviewed as one of the mentally retarded clients. *Id*. at 7-9 He had a service coordinator that assisted mentally retarded clients. *Id*. at 9-10.[5] He needed assistance in obtaining housing as "part of his mental retardation." *Id*. at 11, 45-46, 54. He used a trust fund that ADI set up so the mentally retarded could manage their money. *Id*. at 12. More importantly, Ms. Collins had to take him to buy clothes and food and to pay bills because he would not buy the proper items, he would not get the proper sizes and he often would get the wrong change back. *Id*. at 13-14, 37-38, 53. Mr. Ladd also signed a contract with ADI in which the Department of Labor allowed ADI to pay him less than minimum wage because of his mental handicap. *Id*. at 14-15. Finally, Ms. Collins recalled seeing a chart on Mr. Ladd which reflected an IQ score below 70 and was told that Mr. Ladd was a "mentally retarded client." *Id*.

---

[5] A "service coordinator" was "an advocate for a client who might not be able to advocate for themselves, might not be able to take advantage of these programs in the community." Tr. at 276.

at 15, 32. Significantly, this testimony was supported by records from the Andrew's Center.[6]

Lastly, Dr. Weldon Ash, an unbiased witness employed by the state, *diagnosed* Mr. Ladd as retarded. Pet. Exs. 3C-D. Since 1959, the AAMR definition of "mental retardation" had required a finding of adaptive deficits. AAMR, *Mental Retardation* at 20-23 (Pet. Ex. __). *See also Wyatt v. Stickney*, 344 F.Supp. 387, 389 n.2 (N.D. Ala. 1972) There is absolutely no indication that Dr. Ash did not employ that definition in making his diagnosis and, in fact, Dr. Ash told Dr. Richard Garnett that he stands by that diagnosis today. Tr. at 77.

Of course, the Vineland test given by Dr. Allen is completely invalid. First because it was not intended to be given to a prison population and, second, because it was not meant to be self-reporting. *Id*. at 107-10, 365, 420. Not surprisingly then, Dr. Allen ignored Mr. Ladd's problems noted at the Andrew's Center such as problems managing money and obtaining housing and reporting to work when assessing Mr. Ladd's score on the test. *Id*. at 421-25.

Respondent will point to the fact that Mr. Ladd received his barber license while in prison. Nevertheless, it is understood that "limitations *often* coexist with strengths" and, once the threshold diagnosis of deficits in two adaptive skills areas is reached, it is of no moment how many coexisting "strengths" a person may have. *See Mental Retardation* at 1; Tr. at 59, 146 167. Moreover, the barber teacher, conceded that a retarded person could take the barber course. Tr. at 301-02. Respondent might also point to the testimony of Al Matson, yet Mr. Matson conceded that Ms. Collins would be in a better position to judge Mr. Ladd's adaptive skills while he was at the Andrew's Center. *Id*. at 285-86, 296.

In sum, Robert Ladd is mentally retarded as defined by the State of Texas.

---

[6] *See*Resp. Ex. 3, pg. 125 (Contract allowing ADI to pay Mr. Ladd less than minimum wage); 150-155 (Trust fund documents); 121 (Mr. Ladd found to only have a "limited" knowledge of his rights under the Texas Mental Health and Mental Handicap regulations).

Respectfully submitted,

_____/s/_____
F. Clinton Broden
Tx. Bar 24001495
Broden & Mickelsen
2707 Hibernia
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)

Attorney for Petitioner
Robert Charles Ladd

**CERTIFICATE OF SERVICE**

  I, F. Clinton Broden, certify that on July 29, 2005, I caused the foregoing document to be served electronically on Margaret Schmucker, Assistant Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

                  _____/s/_____
                   F. Clinton Broden