UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| **ROBERT CHARLES LADD,** | ) | CIVIL ACTION NO. |
| | ) | |
| Petitioner, | ) | 1:03cv00239 |
| | ) | |
| v. | ) | |
| | ) | |
| **DOUG DRETKE, Director** | ) | |
| **Texas Department of Criminal** | ) | |
| **Justice, Institutional Division** | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## PROPOSED FINDINGS OF FACT AND CONCLUSION OF LAW

### I. INTRODUCTION

1. In *Atkins v. Virginia*, 536 U.S. 304, 317 (2002), the United States Supreme Court specifically noted that it left it up to the individual states as to how to implement that decision.

2. In *Ex Parte Briseno*, 135 S.W. 3d 1, 8 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals held that the State of Texas would follow the definition of "mental retardation" set forth by the American Association of Mental Retardation (the "AAMR") or as set forth in Tex. Health & Safety Code § 591.003(13).

3. The current AAMR definition of "mental retardation" is: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18."

4. The definition of "mental retardation set forth in Tex. Health & Safety Code § 591.003(13) is: "'Mental retardation'" means significantly sub-average general intellectual

functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."

5. The Court makes its findings of fact and conclusion of law in accordance with the above definitions of "mental retardation."

## II. FACTUAL FINDINGS

1. Robert Ladd was given a full Wesclher IQ score of 67 by the State of Texas while in the custody of the Texas Youth Commission. At the time of the test, Ladd was twelve years old. There is nothing in the records that would indicate that this was an invalid test. The test is supported by a diagnosis of a state psychologist, Dr. Weldon Ash, given at the time. Therefore, the Court credits that test.

2. The Court notes that the 67 IQ was obtained prior to the age of 18.

3. Robert Ladd was given an IQ test by Dr. Thomas Allen in connection with this litigation in which he received an IQ score of 60. That test was invalid because Ladd malingered but the extent of the malingering is unknown. The Court gives little or no weight to that test.

4. It is alleged that Robert Ladd was given a group BETA test in 1980 in which he scored an 86 while in the custody of the Texas Department of Corrections. The giving of that test is unclear given that this test is never reflected on prison records until 1989. Moreover, the BETA is simply an abbreviated screening test with little value. The Court gives little or no weight to that test.

5. The Court heard testimony from Nelma Thomas. Ms. Thomas was the sibling closest to Ladd while he was in his formative years. Ms. Thomas testified about the difficulty Ladd had in playing simple card games and kickball because he could not grasp the rules. She further testified that Ladd would often go outside in freezing weather without a shirt and shoes.

When their mother would send Ladd to the store with a simple order, he had to return repeatedly because he could not remember the order. She testified that Ladd would often get whipped for repeating the same behavior. Ms. Thomas testified that she and her siblings thought he was "different" because he had a different father and would call him names such as "retarded."

6. Following his release from prison, Ladd participated in a drug and alcohol program at the Andrews Center in Tyler, Texas. Nevertheless, the Andrews Center was founded as a community mental health and mental retardation center. Andrews Diversified Industries ("ADI") is associated with the Andrews Center and has a vocational training program in order to train and try to get employment of people with mental disabilities. Clients at ADI normally perform simple, repetitive type of work such as picking up litter or "bench work." Ladd participated in the training program.

7. Carolyn Collins testified by deposition. She was Ladd's supervisor at ADI. Ms. Collins had previously been threatened by Ladd and had testified against him at his state trial and, therefore, she had no reason to lie in his favor and was a very credible witness. Ms. Collins testified that, while Ladd was at ADI, his performance was reviewed as one of the mentally retarded clients. Ladd had a service coordinator that assisted mentally retarded clients. One of Respondent's witnesses testified that a "service coordinator" was "an advocate for a client who might not be able to advocate for themselves, might not be able to take advantage of these programs in the community." Ms. Collins testified that Ladd needed assistance in obtaining housing as "part of his mental retardation." Ladd also used a trust fund that ADI set up so the mentally retarded could manage their money. Ms. Collins had to take Ladd to buy clothes and food and to pay bills because he would not buy the proper items, he would not get the proper sizes and he often would get the wrong change back. Ms. Collins testified that she recalled

seeing a chart on Ladd which reflected he had an IQ score below 70 and she was told that Ladd was a "mentally retarded client."

8.  Ms. Collins' testimony was supported by records from ADI. One record showed that Ladd signed a contract with ADI in which the Department of Labor allowed ADI to pay him less than minimum wage because of his mental handicap. *Id*. at 14-15. Another record found that Ladd only had a "limited" knowledge of his rights under the Texas Mental Health and Mental Handicap regulations.

9.  Prison records indicated that Mr. Ladd could not properly take medicine if they were kept on his person.

10. Dr. Richard Garnett testified that Ladd had adaptive skill deficits in functional academics, work related skills, using community resources, communications, social skills, health and safety.

11. Dr. Thomas Allen testified that Ladd had adaptive skill deficits in functional academics, work related skills, social skills and communication.

12. The testimony of Drs. Garnett and Allen are corroborated by the testimony of Ms. Thomas and Ms. Collins.

13. The Court finds that Ladd is of significantly subaverage general intellectual function based upon the IQ score of 67 previously credited by the Court.

14. The Court finds that Ladd's functioning has concurrent deficits in adaptive behavior in at least two areas.

15. The Court finds that Ladd's mental disability originated before age 18.

16. The Court finds that, either under the definition set forth by the AAMR or the definition set forth in the Tex. Health & Safety Code § 591.003(13), Ladd is mentally retarded.

## III. CONCLUSION OF LAW

Based upon the above factual findings, the execution of Robert Charles Ladd would constitute cruel and unusual punishment in violation of the Eight Amendment to the United States Constitution as fully set out in *Atkins v. Virginia*, 536 U.S. 304, 317 (2002).

Respectfully submitted,

_____/s/_____
F. Clinton Broden
Tx. Bar 24001495
Broden & Mickelsen
2707 Hibernia
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)

Attorney for Petitioner
Robert Charles Ladd

## CERTIFICATE OF SERVICE

I, F. Clinton Broden, certify that on July 29, 2005, I caused the foregoing document to be served electronically on Margaret Schmucker, Assistant Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

_____/s/_____
F. Clinton Broden