IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| ROBERT CHARLES LADD, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No. 1:03 CV 00239 |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice | § | |
| Correctional Institutions Division | § | |
| | § | |
| Respondent. | § | |

RESPONDENT DRETKE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Findings of Fact**

IQ Score

1. During initial state habeas proceedings, the state court conducted an evidentiary hearing on Ladd's claim that trial counsel had been ineffective in failing to present evidence of his a alleged mental retardation and diminished IQ in mitigation of the death penalty.

2. During initial state habeas proceedings, the trial court entered findings of fact that a psychological evaluation had been performed on Ladd as a juvenile resulting in an IQ test score of 67; that a subsequent evaluation resulted in an IQ test score of 86; that Ladd had received his GED and completed barber school while in prison; that the IQ score of 67 was inconsistent with the later IQ score of 86, the completion of his GED, and the completion of barber school; that the IQ score of 67 did not, therefore, support an inference that Ladd was mentally retarded particularly, and that other information indicated that Ladd was not mentally retarded.  III SHTr 72-73  ¶¶ 32, 33, 34, 42, 43.

3. During initial state habeas proceedings, the trial court entered conclusions of law that "[t]he information of low IQ as a juvenile compared with a higher IQ and completion of his GED as an adult made the score invalid." III SHTr 77 ¶¶ 12.

4. During initial federal habeas proceedings, the federal courts agreed with the state court's findings of fact and conclusions of law that Ladd's evidence of low IQ and related juvenile

diagnosis of mental retardation was invalid. *Ladd v. Cockrell*, No. 1:99cv822, slip op. at 7 (E.D. Tex. Oct, 24, 2001), *aff'd* 311 F.3d 349, 360 (5th Cir. 2002), *cert. denied* 538 U.S. 1064 (2003).

5. There are many variables that can affect how a test subject scores on an IQ test, including how the test was administered, and whether the test subject puts forth his best effort. SHSF 81-82, 2 RR 366.

6. While it is possible to feign mental retardation on an IQ test, it is impossible to feign intelligence on an IQ test.

7. Dr. Richard Garnett, a licensed practicing counselor, admitted that Ladd could have malingered on the IQ test given to him as a juvenile. 1 RR 164.

8. Contemporaneous record evidence that Ladd "expressed simply no interest in anything," had "limited *** motivation to improve himself," and suffered from "unsocialized aggressive reaction of adolescence," supports the reasonable inference that Ladd's juvenile IQ score of 67 was the result of poor effort rather than severely limited intellectual ability. Resp. Exh. 1 at 003-004, 015, 017; 2 RR 324-25.

9. Dr. Thomas Allen is a psychologist licensed by the State of Texas. Resp. Exh. 14.

10. Dr. Allen conducted a battery of psychological tests on Ladd in preparation for a hearing in this Court on Ladd's allegations of mental retardation which included the Weschler Adult Intelligence Scale - III (WAIS-III) and Green's Word Memory Test (GWMT). Resp. Exh. 16 at 07-032.

11. The WAIS-III is currently the "gold standard" of IQ tests.

12. The WAIS-III was administered and scored correctly. 1 RR 124.

13. The GWMT is a test of effort, not memory, and its accuracy has been verified by scientific testing. 2 RR 330-31, 353-55, 36-264; Test 044.

14. Ladd received a full scale IQ score of 60 on the WAIS-III administered in April of 2005. Resp. Exh. 16 at 19.

15. Ladd's performance on the GWMT proved that Ladd's score on the WAIS-III administered in April of 2005 was the result of effortful failure rather than severely limited intellectual ability. 2 RR 330-31, 353-55; Resp. Exh. 16 at 044.

16. Dr. Garnett admitted that under the circumstances presented, it could be presumed that Ladd had attempted to deceive the IQ test administrator by feigning mental retardation. 1 RR 147-48.

17. Ladd's April 2005 IQ score of 60 is invalid.

18. The Texas Department of Criminal Justice (TDCJ) routinely administers a short form of the Weschler Adult Intelligence Scale to inmates incarcerated for non-capital offenses. 2 RR 381; SHSF 83.

19. The short form of the Weschler Adult Intelligence Scale is a valid screening device with a band of error + or - 5 to 10 points. 2 RR 381; SHSF 83.

20. Ladd was previously incarcerated for a non-capital offense. Resp. Exh.11 at 004-011.

21. TDCJ administered a short form of the Weschler Adult Intelligence Scale to Ladd during his prior incarceration.

22. There is no evidence that TDCJ improperly administered or scored the short form of the Weschler Adult Intelligence Scale administered to Ladd, or that Ladd somehow cheated on that IQ test.

23. Ladd scored an 86 on the short form of the Weschler Adult Intelligence Scale. Resp. Exh. 11 at 012.

24. Ladd's score of 86 on the short form of the Weschler Adult Intelligence Scale is valid.

25. Where there are conflicting IQ test scores, it is the highest test score which should be utilized in making or rejecting a diagnosis of mental retardation. SHSF 83.

26. Even taking the band of error into consideration, Ladd's IQ score of 86 on the short form Weschler Adult Intelligence Scale is above the recognized cut-off for a diagnosis of mental retardation.

Concurrent Related Adaptive Deficits

27. Significant limitations in adaptive behavior can be established only through the use of standardized measures. AAMR at 23.

28. There is no evidence that Dr. Weldon Ash used standardized measure to establish that Ladd suffered from significant limitations in adaptive behavior as a juvenile.

29. There is no evidence that Dr. Ash even considered whether Ladd suffered from significant limitations in adaptive behavior as a juvenile.

30. Dr. Garnett used no standardized measures in his adaptive deficit analysis. 1 RR 123, 143, 196.

31. Dr. Garnett based his opinion, in part, upon Ladd's unverified answers to a list of questions selected from a textbook of questions that did not comprise a complete standardized test and otherwise lacked any supporting scientific data quantifying responses of interview subjects. 1 RR 138-39.

32. Dr. Garnett based his opinion, in part, upon his perception that Ladd lacked the ability to engage in abstract thought. 1 RR 142-43.

33. The DSM-IV does not mention the inability to think abstractly as a basis for diagnosing mental retardation. 1 RR 142-43.

34. Dr. Garnett's testimony that Ladd lacked the ability to engage in abstract thought is not credible in light of record evidence that Ladd took algebra classes in prison, that the GED contains a math section which includes algebra question, that Ladd passed the GED, and that algebra requires abstract thought.   Resp. Exh. 2 at 019, 021.

35. Ladd's failure to perform in school before age 18 is attributable to truancy secondary to lack of adequate parental supervision and disinterest borne of anti-social tendencies.

36. Ladd passed the GED in prison with little more than a fourth grade formal education. 1 RR 153.

37. Ladd passed his custodial maintenance course with scores of 100 on all class-related assignments and successfully completed all on-the-job training.  WYND 026.

38. Ladd completed his on-the-job barber training program with a 4 ("skilled") rating in all applicable categories.  WYND 030.

39. Ladd passed barber school with scores of 100 on all written tests, and mid-level to perfect scores on all practical skills tests.  WYND 033-34.

40. Ladd passed his barber licensing exam on the first attempt.  WYND 037.

41. Ladd passed his GED, passed his custodial maintenance class, completed his on-the-job barber training, and completed barber school all within 3 years and 3 months. WYND 021, 024, 031, 036.

42. Ladd's ability to pass his GED, pass his custodial maintenance class, complete his on-the-job barber training, and complete barber school all within 3 years and 3 months indicates that Ladd does not suffer from deficits in functional academics or work. 1 RR 151-60; 2 RR 333-35.

43. There is no verifiable evidence that Ladd's inability to obtain a job as a barber while out on parole is attributable to adaptive deficits in seeking work as opposed to his status as an ex-convict or to a lack of motivation to seek gainful employment borne of a properly diagnosed anti-social personality disorder. 1 RR 172-73.

44. Ladd utilized prison resources to assist him in improving his educational assessment score in reading from 5.1 to 10.5 and in math from 6.0 to 9.2 so that he could qualify to attend barber school. WYND 017-020, 041; 2 RR 301-02, 339-42  Resp. Exh. 2 at 19, 30-32, 41.

45. Ladd utilized the resources available to him at the Andrews Center to obtain social support for his drug and alcohol abuse problems, to find employment, to find an apartment, and to manage his money. Resp. Exh. 3 at 40, 148–57, 160-67.

46. Ladd utilizes prison resources to assist his legal case. Resp. Exh. 7, 1 RR 182-183.

47. Ladd utilizes letters to pen pals to obtain financial assistance. Resp. Exh. 12 B-057.

48. Ladd utilizes the prison grievance process to complain about alleged rule infractions by prison personnel. Resp. Exh. 6.

49. Ladd utilizes the prison commissary and understands the *quid pro quo* exchange of cash, commissary account funds or cigarettes for goods and services. Resp. Exh. 8; 1 RR 153; Resp. Exh. 1 at 002.

50. Dr. Garnett's opinion that Ladd suffers from adaptive deficits in utilizing community resources is not credible in light of Ladd's lengthy documented history of utilizing prison, social, and private resources.

51. Dr. Garnett's opinion that Ladd suffers from adaptive deficits in social interpersonal skills is not credible in light of record evidence that Ladd plays games such as kick ball and chess

with age appropriate peers, Resp. Exh. 1 at 134; 1 RR 183, that he relates well to his peers, Resp. Exh 1 at 135, that he had a circle of friends outside of prison, 1 RR 136, that he corresponds with more than 30 pen pals while on death row, Resp. Exh 12, and that he has been married, Resp. Exh. 11 at 007, 1 RR 144, as well as Dr. Garnett's own testimony that Ladd has developed a "support system" on death row, 1 RR 178.

52. Dr. Garnett's suggestion that Ladd "bought" friendship by, *e.g.*, stealing money to take his friends to the movies, is speculation unsupported by any evidence. 1 RR 185.

53. The uniformity of writing style and topical content of the letters contained in Respondent's Exhibit 12 establishes that Ladd corresponds without the assistance of a jailhouse ghost author or scribe.

54. There is no evidence that Ladd has difficulty communicating verbally whereas Ladd's second-chair trial attorney La Juanda Lacy testified during prior state habeas proceedings that she had spoken at length with Ladd and had not noticed any sign of diminished mental capacity, SHSF 95-97, Ladd's expert admitted that Ladd communicates well enough to assist his counsel in preparing detailed legal filings, 1 RR 179, and Ladd's supervisor at the Andrews Center testified that he communicated well enough for his co-workers to understand his meaning, Collins Dep. at 36.

55. There is no evidence that the Windham School's educational assessment of Ladd's ability to read at a 10.5 grade year level is overstated or inaccurate, Resp. Exh. 2 at 41; 1 RR 182, whereas there is ample evidence that Ladd reads and comprehends published articles, Resp. Exh. 12 at B-035-36, D-018, as well as published legal opinions, Resp. Exh. 7, Resp. Exh. 12 at 038.

56. Dr. Garnett's opinion that Ladd suffers from adaptive deficits in either written or verbal communication is not credible.

57. Dr. Allen administered the Vineland Adaptive Behavior Scales to Ladd. Resp. Exh. 16 at 21-32; 2 RR 364-65.

58. The Vineland is a standardized measure of adaptive functioning. 2 RR 365.

59. The Vineland is not normed for a prison population and is not intended to be given as a "self-report" test. 1 RR 124-25; 2 RR 364-65.

6

60. In administering the Vineland, Dr. Allen made adequate efforts to compensate for the fact that the Vineland is not normed for a prison population and is not intended to be given as a "self-report" test. 2 RR 266-68, 379-80.

61. The Vineland, as that test was administered by Dr. Allen, provides a more appropriate and reliable basis for determining the existence or absence of adaptive deficits than Dr. Garnett's subjective methodology.

62. Ladd scored above the mean on the Vineland means for communication skills, daily living skills, and socialization skills, and substantially above the mean on his composite score. 2 RR 368-380, Resp. Exh. 16 at 021-032.

63. Ladd's juvenile and adult records present no gross discrepancies or patterns of deficits that conflict with Ladd's Vineland test results. 2 RR 383-84.

64. The testimony of Ladd's younger sister, Nelma Thomas, that Ladd was unable to understand the rules of childhood games is not credible in light of record evidence that Ladd plays chess in prison.

65. The testimony of Ladd's younger sister, Nelma Thomas, that Ladd's stepfather abused Ladd repeatedly over an extended period of time is not credible in light of record evidence that Ladd's mother and stepfather separated when Ladd was 4 years old, that Ladd's stepfather did not support Ladd or contribute to his welfare, that Ladd's stepfather was thereafter imprisoned for murder and not paroled until 1967 when Ladd was 10 years old, and that Ladd spent the vast majority of the time between age 11 and age 18 in state custody, Resp. Exh. 1 at 3 ("Stepfather") and *passim*. The testimony is otherwise irrelevant to a diagnosis of mental retardation.

66. The testimony of Ladd's maternal aunt, Lubertha Cephus, that Ladd's mother consumed alcohol during her pregnancy and that Ladd weighed 5 lbs. 13 oz. at birth is irrelevant; Ladd presented no expert medical testimony that such evidence, by itself, would support a diagnosis of fetal alcohol syndrome at birth or mental retardation secondary to fetal alcohol syndrome later in life.

67. The Andrews Center was established as a community mental health/mental retardation authority for a five-county area in east Texas and provides services to the State of Texas on a contract basis.  2 RR 257-58.

68. The Andrews Center has a full array of behavioral healthcare services, including substance abuse counseling, *not* for mental retardation support services.  2 RR 258; Resp. Exh. 3 at 023-045; 2 RR 264.

69. The Texas Department of Criminal Justice referred Ladd to the Andrews Center for "substance abuse treatment" upon his parole in November of 1992.  Resp. Exh. 3 at 004.

70. In January of 1993, as Ladd was nearing the completion of his formal drug treatment program, his drug counselor discussed with him the possibility of working for Andrews Diversified Industries (ADI).  Resp. Exh. 3 at 040

71. Not all clients employed by the ADI were mentally retarded; some clients employed by the ADI had substance abuse issues or other mental health diagnoses.  2 RR 259.

72. As a client-employee of ADI, Ladd was assigned jobs too difficult or complex to be handled by ADI's mentally retarded client-employees.  2 RR 264-68, 270.

73. Other than normal supervisory interaction, Ladd did not require any kind of special assistance or training to do his work.  2 RR 268; Collins Dep. at 34-35.

74. Ladd performed well and was considered a good candidate for a promotion, but could not be promoted because he could not pass the criminal background check.  Collins Dep. at 33-342 RR 269.

75. During the summer of 1996, Ladd began missing work and ADI supervisors suspected that Ladd's absenteeism was due to the fact that he had begun abusing drugs and/or alcohol again.  2 RR 271, Collins Dep. at 43-44.

76. Ladd's former work supervisor at the ADI, Carolyn Collins, did not immediately see Ladd's paperwork when he was hired and placed under her supervision at ADI.  Collins Dep. at 30, 42.

77. Because Ladd was a "handicapped client" of the Andrews Center and was referred to ADI for employment, Collins improperly assumed that Ladd was "a mentally retarded client." Collins Dep. at 32, 42-43, 55.

78. The fact that Ladd was variously trained or employed to do jobs that some mentally retarded individuals might be trained or employed to do does not support a diagnosis of mental retardation.

79. Carolyn Collins is not qualified to distinguish between an individual who is "high functioning" mentally retarded and an individual who is of "low average" intelligence. Collins Dep. at 21.

80. To the extent it exists, Ladd's inability to seek or maintain employment is more readily attributed to drug and/or alcohol abuse combined with previously diagnosed anti-social tendencies and lack of motivation than significantly subaverage intellectual functioning; Ladd successfully completed custodial maintenance training, successfully completed barber training, and successfully worked on 15 to 20 different contracts while employed at ADI, most or all of which required the ability to complete complex tasks such as driving a forklift or calibrating scales. 2 RR 267-71.

81. To the extent it exists, Ladd's inability to select clothes of the appropriate size and/or style from a ready-to-wear clothing store at the age of 35 is more readily attributed to the novelty of the experience than significantly subaverage intellectual functioning; the State had provided Ladd's prison attire for his entire adult life up to that point.

82. Ladd's use of an Andrews Center trust account rather than a regular bank checking account is more readily attributed to budgeting his monthly paycheck and the convenience of the arrangement than significantly subaverage intellectual functioning; Ladd's lack of personal transportation and the unavailability of public transportation forced him to rely upon others to bank, pay certain bills, go grocery shopping, and get to and from work. 2 RR 292-94; Collins Dep. at 47-48.

83. Ladd's tardiness and absenteeism from his employment at ADI is more readily attributed to his relapse into drug and/or alcohol abuse combined with previously diagnosed anti-social tendencies and lack of motivation than significantly subaverage intellectual functioning. 2 RR 270-71, Collins Dep. at 43-44.

84. Dr. Garnett is not a physician or psychologist licensed in the state, nor is he certified by the department of mental health and mental retardation to make such diagnosis. 1 RR 34.

85. Dr. Garnett's opinions are based upon scientific, technical, or other specialized knowledge within the scope of Federal Rule of Evidence 702. 1 RR 27-29.

**Conclusions of Law**

1. In order to prevail in this federal habeas corpus proceeding, Ladd must prove by a preponderance of the evidence that (1) he suffers from significantly subaverage intellectual functioning (*i.e.* a valid IQ score of 70 or below) (2) concurrent with related limitations in two or more of the following adaptive skill areas: communication, health and safety, functional academics, leisure and work, and (3) that the foregoing diagnostic criteria for mental retardation manifested before Ladd turn 18. AAMR 9th ed.; DSM-IV; *Atkins v. Virginia*, 536 U.S. 304 (2002).

Intellectual Functioning

2. Federal courts are required to presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Anderson*, 112 F.3d 823, 82 (5th Cir. 1997).

3. The state court's findings of fact and conclusions of law that Ladd's evidence of low IQ and related juvenile diagnosis of mental retardation are invalid are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

4. Ladd has failed to rebut the presumption of correctness of the state court's finding that his juvenile IQ score of 67 is invalid.

5. Ladd has failed to rebut the presumption of correctness of the state court's finding that his juvenile diagnosis of mental retardation is invalid.

6. Ladd has otherwise failed to prove by a preponderance of the evidence that he possesses a valid IQ score of 70 or below.

Adaptive Deficits

7. Every word in the definition of mental retardation is presumed to have been used for a purpose and this Court must give each word effect if reasonable and possible. *Martin K. Eby Const. Co., Inc v. Dallas Area Rapid Transit*, 369 F.3d 464, 469 (5th Cir. 2004); *Perkins v. State*, 367 S.W.2d 140, 146 (Tex.1963). Consequently, the word "related" in the definition

of mental retardation means more than just "concurrent"; it means that to be diagnosed as mentally retarded an individual's concurrent adaptive deficits must be *attributable to* significantly subaverage intellectual functioning. 2 RR 451.

8. Adaptive limitations may co-exist with strengths in everybody, not just the mentally retarded, 1 RR 146, so adaptive deficits such as the inability to seek or maintain employment, balance a banking account, or select appropriately sized clothing without assistance do not support a diagnosis of mental retardation unless they are *attributable to* an individual's significantly subaverage intellectual functioning, 2 RR 451.

9. Adaptive limitations that may be attributed to other factors, *e.g.* drug/alcohol abuse or addiction, anti-sociality, lack of motivation, novelty, convenience, etc., are not *attributable to* an individual's significantly subaverage intellectual functioning. 2 RR 326-28, 449-52.

10. Ladd has failed to prove by a preponderance of the evidence that he suffers from significant, concurrent and related adaptive deficits that are attributable to significantly subaverage intellectual functioning.

Admissiblity of Dr. Garnett's Testimony

11. In a civil action, with respect to an element of a claim or defense as to which state law provides the rule of decision, the competency of a witness shall be determined in accordance with state law. Federal Rule of Evidence 601.

12. A federal habeas corpus proceeding is a collateral civil attack upon the constitutionality of an inmate's conviction and/or sentence, and not a criminal action.

13. It is the perogative of the individual states to develop appropriate ways to enforce the constitutional restriction upon the execution of the mentally retarded. *Atkins v. Virginia*, 536 U.S. 304, 317 (2002).

14. In Texas, mental retardation is determined according to subsection 591.003(13) of the Texas Health and Safety Code. *Ex parte Briseno*, 133 S.W.3d 1, 5 (Tex. Crim. App. 2004).

15. Mental retardation in subsection 591.003(13) of the Texas Health and Safety Code is defined within the context of companion subsection 591.003(16) of the Texas Health and Safety Code.

16. Pursuant to subsection 591.003(16) of the Texas Health and Safety Code, a person with mental retardation "means *a person determined by a physician or psychologist licensed in the state or certified by the department* to have subaverage intellectual functioning with deficits in adaptive behavior." TEX. HEALTH & SAFETY CODE § 591.003(16) (emphasis added).

17. Dr. Richard Garnett is not qualified to testify as an expert at a federal evidentiary hearing on the issue of mental retardation in the context of a capital murder case. *In re Hearn*, 2005 WL 1691538 (July 20, 2005) (Smith, J., dissenting) (stating that even under the majority's opinion, "the district court is free to rejected [a purported expert's] testimony, including for the reason that he is not qualified in Texas to opine as to mental retardation under § 591.003(16) [of the Texas Health and Safety Code]").

18. Dr. Garnett is not permitted to testify as a lay opinion witness. Federal Rules of Evidence 701(c), 703.

Mental Retardation

19. Robert Charles Ladd is not mentally retarded and is, therefore, not entitled to federal habeas corpus relief under the Eighth Amendment and *Atkins v. Virginia*, 536 U.S. 304 (2002).

20. No reasonable jurist would dispute that Robert Charles Ladd is not mentally retarded.

    Respectfully submitted,

    GREG ABBOTT
    Attorney General of Texas

    BARRY R. McBEE
    First Assistant Attorney General

    DON J. CLEMMER
    Deputy Attorney General for
    Criminal Justice

    GENA BUNN
    Assistant Attorney General
    Chief, Postconviction Litigation Division

/s/Margaret Schmucker
_____
MARGARET SCHMUCKER*
Assistant Attorney General
Texas State Bar No. 24030874

*Attorney-in-charge

Office of the Attorney General
Capital Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1600
(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, Margaret Schmucker, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Proposed Findings of Fact and Conclusions of Law** has been served electronically upon counsel for petitioner.

/s/Margaret Schmucker
_____
MARGARET SCHMUCKER*
Assistant Attorney General
*Attorney-in-Charge