# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF TEXAS

# BEAUMONT DIVISION

| | | |
|---|---|---|
| ROBERT CHARLES LADD, | § | |
| Petitioner, | § | |
| vs. | | No. 1:03cv239 |
| | § | |
| RICK THALER, Director, | | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | | |
| | § | |
| Respondent. | | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on Petitioner Robert Charles Ladd's ("Ladd's") application for a writ of *habeas corpus* (document #8) filed on June 20, 2003 and Respondent Rick Thaler's ("the Director's") response, followed by an evidentiary hearing held on June 27-28, 2005 and subsequent briefing. Also before the court is the Director's motion for judgment denying *habeas corpus* relief with prejudice (document #89) filed on June 4, 2012. Having considered the record, the arguments and authorities in the pleadings, and having conducted an evidentiary hearing, the court concludes that the Director's motion is well-taken and it will be granted. Further, the court concludes that the petitioner's application is not well-taken and it will be denied.[1]

---

[1] The court acknowledges the Director's complaint about the court's delay in deciding this case. However, because of the court's caseload, the undersigned judge must often choose between thoroughness and timeliness. In order to be thorough and careful, the court may, on occasion, set aside complex matters for an extended period due to the weight of the court's caseload.

## I. Background

In 1978, Ladd was convicted of murdering a young woman and her two small children and setting fire to their house. He was sentenced to 40 years in prison, but was released after 16 years. In 1996, Ladd killed a young mentally impaired woman with whom he worked, and set fire to her apartment. Ladd was indicted for capital murder, the killing having taken place during the commission of burglary, robbery, sexual assault and arson. On August 23, 1997, he was convicted of the charge and on August 27, 1997, he was sentenced to death. On October 6, 1999, his conviction was affirmed. *Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999). On April 17, 2000, his request for a writ of *certiorari* was denied by the Supreme Court of the United States. *Ladd* v. Texas, 529 U.S. 1070 (2000). Ladd then filed a petition for post-conviction relief, which was denied by the Texas Court of Criminal Appeals on December 15, 1999. *Ex parte Ladd*, No. 42,639-01 (Tex. Crim. App. 1999).

On January 18, 2001, Ladd filed an application for a writ of *habeas corpus* in this court. In that application Ladd claimed, *inter alia*, that his attorney rendered ineffective assistance by not contending during the punishment phase of his trial that he was mentally retarded. The court found that the evidence of mental retardation which Ladd presented in his application was not so convincing that it rebutted the presumption that Ladd's counsel acted reasonably in not raising the claim. Accordingly, on October 24, 2001, the court denied Ladd's application. The United States Court of Appeals for the Fifth Circuit affirmed. *Ladd v. Cockrell*, 311 F.3d 439 (5th Cir. 2002).

In June of 2002, the Supreme Court of the United States held that executing the mentally retarded constituted cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304 (2002). On April 7, 2003, Ladd filed a second petition for post-conviction relief in state court. On April 17,

2003, the Texas Court of Criminal Appeals dismissed Ladd's petition as an abuse of the writ because "it fail[ed] to contain sufficient specific facts which would satisfy the requirements of [TEX. CODE CRIM. PROC.] Art. 11.071, Sec.5 (a)." Ladd appealed this ruling, but simultaneously requested authorization from the United States Court of Appeals for the Fifth Circuit to file a second application for a writ *habeas corpus* in this court. On April 23, 2003, the Fifth Circuit granted the request, and on June 20, 2003, Ladd filed the present application. On June 27, 2005, the court conducted an evidentiary hearing on the application.[2]

## II. Substantive legal principles

In *Atkins,* the Supreme Court noted that

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded . . . As was our approach in *Ford v. Wainwright*. . . we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id*. at 317.

The Texas Legislature has not yet enacted any guidelines for determining mental retardation in the capital punishment context, but in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals set forth interim guidelines for courts considering state post-conviction claims of mental retardation. The court stated that it would apply the definitions of mental retardation promulgated by either the American Association of Mental Retardation, which

---

[2] The court is obliged to point out that in *Cullen v. Pinholster,*___ U.S. ___, 131 S.Ct. 1388 (2011), the Supreme Court of the United States held that when a state court adjudicates a claim on its merits, review of that claim under 28 U.S.C. Sec. 2254 is restricted to the record before the state court. Also, in *Coleman v. Thompson,* 501 U.S. 722 (1991), the Supreme Court held that if the state court dismisses a claim on independent and adequate state law grounds, such as procedural default, federal court review of the merits of the claim is foreclosed entirely. In the present case, there is some question as to whether the state court's rejection of Ladd's mental retardation claim was an abuse of the writ is a dismissal on procedural grounds or an adjudication on the merits, *see e.g. Balentine v. Thaler,* 626 F.3d 842 (5th Cir. 2010). However, whether the state court's rejection of Ladd's mental retardation claim was an adjudication on the merits or a dismissal on procedural grounds, this court could not consider the evidence that was produced in the evidentiary hearing unless the present situation meets an exception to the holdings in these two cases. Because neither party has raised this issue, however, the court will rely upon the evidence produced at the evidentiary hearing in deciding this claim.

is now known as the American Association for Intellectual and Developmental Disabilities (AAIDD) or the Texas Health and Safety Code §591.003(13). The AAIDD definition utilizes a three part test:

1. Significantly subaverage general intellectual functioning (defined as an IQ score of about 70 or below),

2. accompanied by related limitations in adaptive functioning (defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and usually, standardized scales),

3. the onset of which occurred before age 18.

The Texas Health and Safety Code definition is similar:

Mental retardation means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period. Adaptive behavior means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group.

## III. Standard of review

Because the state courts did not provide Ladd a hearing, the court will determine *de novo* whether Ladd is mentally retarded, using the AAIDD definition of mental retardation.[3]    Ladd bears the burden of establishing the three elements of that definition by a preponderance of the evidence.

---

[3] In Ladd's state and federal post-conviction proceedings, he raised the issue of whether his attorney rendered ineffective assistance by not raising his alleged mental retardation as a mitigating factor in sentencing. The state court found that Ladd's IQ score of 67 was insufficient to establish the sub-average intellectual functioning component of mental retardation because Ladd later achieved an IQ score of 86, and the higher of the two scores should be considered more reliable. Because both experts in the present case testified that Ladd's IQ score of 67 was obtained on the Wechsler test, his score of 86 was obtained on the Beta test, and the Wechsler test is considered a more accurate and reliable test, the court finds that the state court's findings on this issue have been rebutted by clear and convincing evidence. See 28 U.S.C. § 2254 (e)(1). The court will accordingly determine the issue of Ladd's alleged mental retardation *de novo.*

## IV. Evidence presented at the hearing

Dr. Richard Garnett, a licensed professional counselor, testified that in his opinion Ladd was mentally retarded.[4]  He reached this conclusion based upon two and a half hours of interviewing, observing, and testing Ladd, as well as reviewing Ladd's medical records, police records, juvenile and adult incarceration records and previous testimony in his capital murder trial.  On the first part of the AAIDD test to determine mental retardation, Dr. Garnett testified that Ladd had significantly subaverage intellectual functioning, based upon an IQ score of 67 which Ladd obtained when he was thirteen years old.  Dr. Garnett explained that when Ladd was committed to the Texas Youth Commission, he was given the Wechsler Adult Intelligence Scale IQ test, and he also met with a psychiatrist on three occasions.  The psychiatrist, Dr. Phillip Ash, recorded in his notes on these meetings that Ladd appeared obviously mentally retarded.  Dr. Garnett testified that he had spoken with Dr. Ash and that he relied in part on Dr. Ash's notes and opinion in reaching his own.  Dr.

---

[4] The Director objected to Dr. Garnett's testimony on the ground that he was not competent to testify because he was not a licensed psychologist or psychiatrist.  The court took the objection under advisement and listened to his testimony.  It now rules that Dr. Garnett was competent to testify.  Federal Rule of Evidence 601 states that in actions in which state law supplies the rule of decision, the competency of a witness to testify shall be determined in accordance with state law.  The Texas Court of Criminal Appeals held that Dr. Garnet was competent to testify about whether  a capital defendant was mentally retarded.  *Ex parte Lewis*, 223 S.W.3d 372 (Tex. Crim. App. 2006).  The majority opinion in *Lewis* did not explain why  it reached this decision, although a concurring opinion offered a rationale.   The court, however, relies on an alternative explanation:

Section 591.003 of the Texas Health and Safety Code provides that a person with mental retardation means a person determined by a physician or psychologist licenced in this state or certified by the department to have subaverage intellectual functioning with deficits in adaptive behavior.

Section 591.003 is ambiguous, because it is unclear whether the terms "certified by the department" refers to the person being diagnosed or to the physician or psychologist doing the diagnosing.  The Director contended that the terms referred to the physician or psychologist; in other words, to be mentally retarded in Texas, a person had to be determined so by a physician or psychologist who is either licensed in Texas or certified by the Department of State Health Services.

Ladd contended that the terms referred to the person.  In other words, to be considered mentally retarded in Texas, a person had to be either determined to be mentally retarded by either a physician or a psychologist licensed in Texas or certified as mentally retarded by the Department of State Health Services.  Dr. Garnett testified that he helped draft this regulation and that the drafters intended the  interpretation offered by Ladd.  Under this interpretation, the Department of State Health Services could determine that an individual was mentally retarded and thus eligible for state services based upon the opinion of a licensed professional counselor such as himself.  Dr Garnett testified that he had provided expert testimony to the Board for this purpose on numerous occasions and that he had been found competent to opine as to whether an individual was mentally retarded in both state and federal courts.

Garnett also testified that he relied in part on Ladd's birth records which showed a low birth weight, which is consistent with fetal alcohol syndrome and impaired functioning.

Dr. Garnett acknowledged that Ladd had later achieved a score of 86 on a less comprehensive IQ test, known as the "Beta" test, but said that it not as accurate as the Wechsler test. He also testified that although Ladd had recently attained a score of 60 on another Wechsler IQ test, that score was not valid because Ladd malingered.

Regarding the second part of the AAIDD test, Dr. Garnett testified that Ladd had significant adaptive skills deficits in the areas of functional academics, including money concepts, work-related skills, using community resources, communications skills and social skills. Dr. Garnett also testified that these deficits, on the whole, did not include deficits that could be attributed to anti-social personality disorder. He acknowledged that there were no valid instruments for measuring the adaptive skills of incarcerated individuals, so his opinion on this issue was based upon his clinical judgment.

Dr. Garnett acknowledged that Ladd had written many letters which appeared to have been written by someone who was not mentally retarded, but he explained that he had talked with Ladd about the letters and had come to the conclusion that Ladd had received significant support and assistance in writing them. He also acknowledged that Ladd had obtained a G.E.D. and apparently knew how to play chess, but he explained that neither of these accomplishments were beyond the reach of the mildly mentally retarded.

Finally, concerning the third part of the AAIDD test for mental retardation, Dr. Garnett testified that because Ladd's IQ score of 67 was attained when he was thirteen, because family members stated that Ladd displayed an inability to communicate effectively before that time, and

because Ladd's school records showed the inability to function effectively in the school environment, Ladd's intellectual and adaptive functioning deficits manifested themselves before he was eighteen years old.

On cross-examination, Dr. Garnett admitted that although Ladd was a "latch-key kid," he appeared to have been able to take care of himself since he was not malnourished and was appropriately dressed when he was evaluated by the Texas Youth Commission. He also acknowledged that by age 11, Ladd understood how to identify one and five-dollar bills and that at that age he once stole a wallet and used the money to treat his friends to a day at the movies. He admitted that Youth Commission records showed that Ladd played kick ball with his peers and that he seemed to have appropriate social interactions with them. He also acknowledged that Ladd participated in a robbery with four other individuals when he was fifteen years old and that Ladd's inability to maintain friendships could have been a result of his temper rather than mental retardation. Dr. Garnett confirmed that Ladd has been repeatedly diagnosed as having anti-social personality disorder and that his reading ability has been assessed at above the tenth grade level, although the mentally retarded usually cannot read above the seventh grade level. He also acknowledged that Ladd successfully completed vocational training programs in barbering and in custodial maintenance in prison and that Ladd was successful, albeit in a structured environment, in working from the time he was released from prison until he committed the present crime. He testified that although Ladd did use a calculator in attempting to keep track of his commissary account, he made several errors in doing so, and that when Ladd was working, his employer kept his money in a trust account for him.

Lubertha Cephus, Ladd's mother's first cousin, testified that she worked with Ladd's mother during the time that she was pregnant with Ladd. Cephus said they would always drink after work, and that Ladd's mother would drink whiskey from a flask, usually not stopping until the flask was empty.

Russell Pinckard, a death row guard, testified that although death row inmates are confined to their cells for 23 hours per day, they communicate by passing notes from cell to cell, and he had seen Ladd pass such notes. Pinckard also testified that inmates are able to talk to each other during their daily hour of recreation.

Nelma Thomas, Ladd's sister, testified that she is a year younger than Ladd and was closer to him emotionally than his other sister or his three brothers. Thomas played cards with Ladd, but she noticed that he did not seem to understand the concept of suits in a card game. She also testified that she played kickball with him, but he did not understand that he needed to run to first base after kicking the ball. Thomas testified that at ages 12 to 14, Ladd often did not dress appropriately for the weather conditions and that two of his brothers used to call him retarded. She also testified that he was unable to remember what to buy when their mother sent him to the store. She further said that when he was disciplined, he would not learn from that and change his behavior. On cross-examination, Thomas acknowledged that between the age of 10 and 15, Ladd did have a friend named Larry with whom Ladd often committed criminal acts.

The Director's first witness was Penny Long, the prison mail room supervisor, who testified that all non-privileged inmate correspondence is opened and read and that privileged mail is not. "Privileged" is defined as mail to or from a licensed attorney. Long testified that inmates were given a copy of these mail regulations. She also testified that she had been requested by the Attorney

General's office to make copies of Ladd's non-privileged correspondence and that she did so.

Al Matson testified that since 1993, he has managed the vocational division at the Andrews Center. He said that the Andrews Center is a community mental health/mental retardation healthcare center, providing counseling, group homes, day programs, and employment training and opportunities. Matson testified that 90% of the client workforce is comprised of persons with mental retardation.

Matson also testified that Ladd was referred to the center from a substance abuse facility not as a mental retardation referral. Matson also said that Ladd had above average skill and ability, so he ended up doing some of the more challenging jobs available, such as "line leader" and quality control. Matson trusted Ladd and even employed him personally to help his (Matson's) fiancé move out of her apartment and into their home when they got married. Matson said that for the first couple of years, Ladd was an excellent employee who was very capable. He could sort through Wilsonart laminated chips and ensure that all colors and patterns were strung on the chain of samples. He could operate an ultrasonic welding machine, set up electronic weigh scales, and operate a forklift. Matson did not believe that a mentally retarded person could operate a forklift, and he found that Ladd did not require special assistance or training beyond what a non-retarded person would have needed to do these tasks. Matson testified that Ladd did not require extra attention or direction and that he probably would have been promoted except that he would not have passed the required criminal background check. Matson also testified that he never noticed in Ladd any of the characteristics he noted in his mentally retarded workers and that Ladd was terminated because of increased absenteeism and confrontations with his supervisors.

On cross-examination, Matson testified that to be eligible for the Andrews Center's services, an individual must suffer from mental retardation, schizophrenia, bi-polar disorder or major depression, although exceptions were sometimes made. Matson also testified that the Department of Labor allows the Center to pay less than minimum wage to its client workforce because mentally retarded people are generally not as productive as non-mentally retarded workers, and he acknowledged that Ladd was paid less than minimum wage.

Matson also testified that Ladd's wages were paid into a trust fund and that Ladd received the assistance of a service coordinator in managing his money. In reviewing a report from Carolyn Collins, Ladd's service coordinator, Matson admitted that Collins explained to Ladd his rights under the Texas Mental Health and Mental Retardation Guidelines, but felt that Ladd had only a limited understanding of those rights. Matson said that it was reported to him that Ladd had threatened Collins on one occasion.

On redirect examination, Matson testified that although Ladd did not meet the requirements to be employed at the Andrews Center because his substance abuse problem did not qualify, an exception to that requirement was made in his case. He also testified that although Ladd was initially paid below minimum wage the same as the mentally retarded workers, Ladd received raises and was eventually paid above minimum wage. Matson said that trust funds were not exclusively used by mentally retarded workers.

Howard Alexander testified that for over twenty years he taught inmates how to cut hair. He said that the barber program in which he taught required inmates to have at least a seventh grade education and that it would be unlikely that anyone with a serious learning deficiency could successfully complete the program. Alexander remembered Ladd, but did not have any memories

about teaching him.  He did read from Ladd's records confirming that Ladd passed the state barber

exam, that Ladd was one of his better students, and that his scores in the class were high.

Dr. Thomas Allen, a forensic psychologist, testified that in his opinion Ladd was not mentally

retarded.  Dr Allen said that he could not trust the IQ score of 67 that Ladd obtained at age 13

because Ladd had been identified as a person with a propensity for prevarication and low motivation,

and there was no indication in the records that the tester had assessed Ladd's effort when he (Ladd)

took the test.

Dr. Allen also testified that the IQ score of 86 that Ladd attained when he first went to prison

was worthy of some consideration, even though it was just a screening device, because Ladd's score

on that test put him in the "average" range of prisoners being screened.  He also testified that Ladd's

recent score of 60 was unreliable because he had malingered.

Dr. Allen stated that he found no documentation that anyone had done a systematic

assessment of Ladd's adaptive deficits.  He testified that the behavioral observations which appeared

in the records focused mainly on Ladd's aggression and anti-social conduct.  He concluded that the

records revealed no behavior deficits that are typically associated with mental retardation.

Dr. Allen testified that he administered the Vineland Adaptive Skills Inventory to Ladd, with

several of the questions modified to better elicit useful answers.  Although he admitted that the test

had not been normed on prisoners, Dr. Allen nevertheless opined that it established that Ladd's score

would have placed him the middle or average range and was therefore not significant because it did

not place him within the bottom 2 - 3 % of the population.  Dr. Allen also testified that based upon

his interview with Ladd and his review of Ladd's records, any deficits in adaptive behavior which

Ladd possessed were better explained by Ladd's anti-social personality disorder rather than by any

11

supposed deficits in intellectual functioning. For example, Dr. Allen testified that Ladd's failure in functional academics as a youth was not related to his intellectual functioning, but was instead because of conduct problems. He also testified that in his opinion Ladd failed in conventional work settings because Ladd preferred to commit crimes instead of do regular work. He stated that as long as Ladd wanted to pursue a legitimate career, such as barbering, he did fine, but he eventually returned to his main goal, which was to be a criminal. He also denied that Ladd had any deficit in using community resources, saying that Ladd was able to participate in groups when he wanted to, but the groups he wanted to participate in were groups of criminals. To the extent that Ladd had any difficulties with groups, Dr. Allen opined that those difficulties were related to Ladd's conduct disorders, not his intellectual functioning.

Dr. Allen also testified that any deficits Ladd may have had in social-interpersonal skills were again related to his antisocial conduct disorder, and he reached the same opinion as to Ladd's communications skills. He testified that it would be very rare for someone to have both mental retardation and anti-social personality disorder, although it was possible.

On cross-examination, Dr. Allen testified that he had provided testimony in Ladd's capital murder trial in which he opined that there was a probability that Ladd would be dangerous to society in the future. He agreed that an IQ score in the range of 65-75 was indicative of significantly sub-average intellectual functioning and that to be mentally retarded a person must have adaptive deficits in at least two areas. He acknowledged that at the time that Ladd obtained an IQ score of 67, Ladd did not have a motive to malinger comparable to avoiding execution and that the test giver made no notations to the effect that Ladd malingered. He also acknowledged that the individuals at the Texas Youth Commission who administered the test to Ladd are trained to give the IQ test and do make

notations when they believe that a subject is not putting forth his best effort. He admitted that no such notations appear in Ladd's test file.

Dr. Allen also acknowledged that Dr. Phillip Ash interviewed Ladd shortly after the first IQ test, and Dr. Ash noted that Ladd seemed "rather obviously retarded." However, Dr. Allen testified that because Dr. Ash's report does not reflect that he evaluated Ladd's adaptive skills deficits, Dr. Ash's report is unconvincing. Dr. Allen admitted, however, that he was not aware of the criteria for mental retardation at the time Dr. Ash made his determination. Dr. Allen also acknowledged that observations and assessments occurring during an individual's developmental years, if done properly, are likely to be the most accurate indicators of intellectual functioning and adaptive skills deficits.

Dr. Allen agreed that it is possible for a mentally retarded person to put forth less than their best effort on an IQ test and also agreed that had Ladd not malingered on the most recent test, his IQ score might still have been less than 75, although such a result was unlikely. He also admitted that the Vineland Adaptive Skills Inventory has not been normed on criminals or prisoners and that as a result it is difficult to generalize from a raw score on the test. He also admitted that he did not follow the Vineland test protocols, which require that the test giver not rely on self-reporting by the subject. He acknowledged that Ladd was polite and cooperative during his interview with him. He also admitted that when testifying on this same issue in a different case, he criticized a defense expert for relying on the Vineland test.

On questioning from the court, Dr. Allen reiterated his opinion that Ladd had deficits in functional academics, work skills, interpersonal relations and communications skills, but that those deficits were not related to sub-average intellectual functioning, rather they were related to anti-

social personality disorder.  He opined that Ladd did not have a deficit in utilizing community resources.

Dr. Richard Garnett testified in rebuttal that the definition of mental retardation in use in 1969 placed less emphasis on adaptive skills deficits than the present definition.  He also testified that in his opinion as an expert in the field, deficits in adaptive behavior do not necessarily have to be caused by sub-average intellectual functioning in order to be "related" to such functioning, rather, they are correlated in that they interact with each other.

Carolyn Collins testified by deposition that she worked at Andrews Diversified Industries ("ADI") for 14 years until 1999.  Collins said that she had on several occasions been threatened by Ladd and that she had no reason to lie on his behalf.   She testified that each project or contract undertaken by ADI was supervised by an individual and those supervisors reported to her.

Collins stated that, in her opinion, Ladd was a high-functioning  mentally retarded person.  She testified that ADI employed individuals who were profoundly, severely, moderately, and mildly mentally retarded, as well as people who were not retarded.  She testified that her division of the company did not employ people with substance abuse problems.  Those individuals were employed in a different division of the company.  Collins was responsible for processing new clients referred to ADI from the Andrews Center.  Collins testified that she was required to keep certain records for clients (employees) of ADI who were mentally retarded and that among the items recorded in those records were how many "prompts" a client required each day in order to be productive.  She testified that Ladd was one of the clients for whom she was required to keep such records and that one of her jobs was to review the records submitted by the supervisors detailing the number of prompts each client received.

Collins also testified that she took Ladd to and from work and would often take him shopping because he had problems with managing his money and he tended to buy clothes in the wrong size. She said that when Ladd used profanity, he sometimes said the words in the wrong order. She also stated that she helped him write letters on occasion.

On cross-examination, Collins admitted that Ladd's referral form from the Andrews Center to ADI said that he was being referred for cocaine and alcohol abuse and that the space by "mental retardation" had been left blank. She also admitted that Ladd's registration form at ADI said the same thing. She acknowledged that Ladd consistently denied being mentally retarded and that one reason she took him to and from his house was because he did not have a car and no public transportation ran near his house.

## V. Analysis of Claim

### A. Significantly sub-average intellectual functioning

Based upon the evidence presented at the hearing, the court finds by a preponderance of the evidence that Ladd has significantly sub-average intellectual functioning. The AAIDD definition of mental retardation requires an IQ score of about 70-75 or below. At age 13, Ladd was given a Wechsler IQ test and obtained a score of 67. Ladd's two later IQ scores of 86 and 60 were considered by both experts (Dr. Garnett and Dr. Allen) to be less reliable than the first test. The higher score of 86 was unreliable because the test instrument itself was less accurate than the Wechsler, and the lower score of 60 was unreliable because Ladd malingered.

## B. Significant related limitations in adaptive functioning

To be mentally retarded , an individual must demonstrate deficits in adaptive behavior in at least two of the following ten skill areas: communication, functional academics, self-direction, social skills, leisure, self-care, home living, community use, health and safety, and work.[5] The AAIDD definition of mental retardation, however, requires that an individual's deficits in adaptive functioning be "related," although it does not specify to what they must be related. In *Briseno*, the Texas Court of Criminal Appeals instructed fact-finders to consider whether the evidence of adaptive skills deficits was indicative of mental retardation or of a personality disorder. *Briseno*, 135 S.W.3d at 8. The court therefore construes the term "related" as meaning indicative of sub-average intellectual functioning, as opposed to indicative of a personality disorder.

Both experts agreed that Ladd has demonstrated deficits in adaptive behavior in functional academics, social skills, work, and communication, and both experts also agreed that Ladd has an anti-social personality disorder. Dr. Garnett, however, said that in his opinion Ladd was afflicted with both mental retardation and the personality disorder and that Ladd's deficits in adaptive functioning should be attributed to mental retardation rather than to a personality disorder. Dr. Allen testified that Ladd's deficits were more likely caused by the personality disorder rather than by mental retardation. The issue for the court is which expert's opinion is more persuasive.

---

[5] This test is from the 1992 definition. The 2002 definition lists 16 adaptive skills, places them in three domains, and requires that an individual score more than two standard deviations below the mean as to either one domain or the combination of all three domains. *See* AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS 81-82 (10th ed. 2002 ). Both parties proceeded under the assumption that the 1992 definition was applicable in this case

Both experts agreed that it is possible for an individual to both be mentally retarded and have an anti-social personality disorder, but such a combination would be extremely rare.  Regarding functional academics, the court notes that by age 19 Ladd had achieved only the fourth-grade level.  However, the court also notes that Ladd was not in special education classes and that much of his problems at school were due to truancy and fighting.  Further, the court notes that in a short time span in prison, Ladd improved his educational achievement level from the fourth grade level to the tenth grade level and obtained a G.E.D.  After that, Ladd took a barber course and received high marks and passed the state barber exam.  Ladd's low IQ did not stop him from functioning academically at an apparently non-mentally retarded level when he was motivated to do so.  The court also notes that Ladd malingered on his recent IQ test in order to avoid execution.  The court finds that Ladd's academic functioning is more likely related to his perceived self-interest than to any intellectual deficiency.

Regarding deficits in social skills and work skills, Dr. Garnett testified that Ladd's deficits in this area could be the result of either his anti-social personality disorder, his sub-average intellectual functioning, or both.  For example, a person with mental retardation would have a deficit in the social area because he does not understand the give and take and cannot read people, whereas the anti-social person does not care about the other person.  Dr. Garnett testified that in his opinion Ladd's deficits in these areas could not be specifically attributed to anti-social personality disorder, but he did not provide any basis for that opinion.  Dr. Allen testified that Ladd's inability to control his temper, which led to a history of fighting and violent conduct, combined with the fact that Ladd worked steadily between the time he was released from prison until being fired for insubordination and inappropriately aggressive behavior such as threatening supervisors, indicates that his deficits

in adaptive behavior skills in these areas were more likely caused by his anti-social personality than by mental retardation. The court finds Dr. Allen's testimony more persuasive than Dr. Garnett's testimony on this issue and thus finds by a preponderance of the evidence that Ladd's deficits in work skills and social skills are indicative of a personality disorder rather than an intellectual deficiency.

Regarding using community resources, Dr. Garnett testified that Ladd's deficit in this area resulted from his inability to see the value of participating as a member of the community, while Dr. Allen testified that Ladd did see the value of participating as a member of the community of criminals and did in fact participate in group crimes. The court finds that any defect Ladd may have had in using community resources is just as indicative of anti-social personality disorder as it is of intellectual deficiency. The court therefore finds that Ladd has not carried his burden of proof on this issue.

Regarding communications skills, neither expert testified that the inability to communicate is indicative of anti-social personality, so the court finds it more likely than not that Ladd's deficiencies in this area are related to intellectual deficiencies rather than to anti-social personality disorder.

Because Ladd has only established that one of his deficits in adaptive behavior - a deficit in communication skills - is related to his sub-average intellectual functioning, he does not meet the AAIDD definition for mental retardation.

In addition to being "related," an individual's deficits in adaptive skills must also be "significant." The AAIDD states that for the diagnosis of mental retardation, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these

standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the three types of adaptive behavior: conceptual, social or practical, or (b) an overall score on a standardized measure of conceptual, social and practical skills.

In a normal distribution, also known as a standard bell curve, 4.6% of the scores of a random sample will fall outside of two standard deviations from the mean score of the sample. Of that 4.6%, 2.3% of the scores will fall more than two standard deviations below the mean and 2.3% of the scores will fall more than two standard deviations above. *See* BARNES, STATISTICS AS PROOF 139-40 (1983). Accordingly, a mentally retarded person exhibits both less intelligence and less ability to adapt than 97.7% of the general population.

Dr. Garnett opined that Ladd's deficits in adaptive functioning were significant, while Dr. Allen opined that they were not. The court again finds Dr. Allen more credible on this point. Both witnesses agreed that the currently accepted tests for adaptive skills deficits are not accurate, reliable or valid for testing prisoners on death row and that clinical judgment is necessary. Dr. Garnett explained how Ladd's adaptive skills were deficient, but he provided no examples by which the court could make a reasoned determination of whether Ladd's deficits place him in the bottom 2.3 percent of the population as opposed to the bottom 10 percent, the bottom 25 percent, or the bottom 33 percent. By contrast, Dr. Allen attempted to use a recognized test for determining adaptive skills deficits, the Vineland Adaptive Skills Inventory, modified to take into account the unique circumstances of a death row inmate. Ladd's scores on this modified test suggested that he was in the middle of the population in adaptive skills. Based upon these scores, Dr. Allen opined that Ladd's adaptive skills were well-above the bottom 2.3 percent of the population. The court

notes that even without a valid and accurate testing scale, there is evidence in the record which suggests that Ladd's adaptive skills are substantial. For example, in the area of using community resources, Ladd was able to utilize the resources in prison - his community at that time - to obtain a G.E.D. and to obtain a barber license. He was also able to utilize the resources at the Andrews Center to obtain housing, transportation to and from work, a trust fund, a service coordinator, and steady employment. After committing the present crime, Ladd was able to use the prison library to research the *Atkins* case and utilize the services of other inmates to help him write letters. Although Dr. Allen's approach is not beyond debate, the court finds his opinion more persuasive than Dr. Garnett's conclusory opinion. Accordingly, the court finds that Ladd has failed to establish by a preponderance of the evidence that any of his deficits in adaptive functioning are significant.

### C. Onset before the age of 18

Because both experts agreed on this point, the court finds by a preponderance of the evidence that Ladd's deficits in intellectual functioning and adaptive behavior manifested before his 18th birthday.

## VI. Conclusion

To establish that he is mentally retarded, Ladd was required to establish by a preponderance of the evidence that he has significantly sub-average intellectual functioning, that he has deficits in at least two adaptive skill areas which are both significant and related to his sub-average intelligence, and that his sub-average intellectual functioning and adaptive skills deficits manifested before his 18trh birthday. Because Ladd has failed to establish by a preponderance of the evidence the existence of two significant deficits in adaptive behavior which were both statistically significant and related to his sub-average intellectual functioning, the court finds that he has not established that he

is mentally retarded. Ladd's application for a writ of *habeas corpus* (document #8) is DENIED with prejudice and the Director's motion for judgment denying *habeas corpus* relief with prejudice (document #89) is GRANTED.

**SIGNED this the 15th day of February, 2013.**

_____

RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE